TATE, Judge
(dissenting in part).
It is with some regret that the writer must differ from his conscientious brethren of the majority. If only one municipality were concerned, perhaps the majority’s construction of the Lawrason Act, LSA-R.S. 33:321 et seq., could be allowed to pass in silence; but the effect of the majority’s interpretation of this general statute (providing a form of government for some two hundred municipalities in this state) is, in my opinion, to effect so radical a change in the municipal government of this state as to require, for the benefit of any higher reviewing court, a full exposition of the dissenting views.
I am unable to concur in the basic holding of the majority that the mayor’s veto power is limited to the relatively few “legislative” ordinances adopted by the council. In my opinion, the veto power of the mayor — the statutory chief executive of the municipality — also extends to the manifold administrative ordinances forming most of the business of the town council. To hold that it does not, reduces the function of the mayor merely to preside at council meetings and to cast a deciding vote if there is a tie (if an alderman happens to be absent). For the majority’s interpretation divests the mayor of all administrative powers whatsoever, in contravention, it seems to me, of the legislative intent that he do have such powers commensurate with his statutory duty to serve as the chief administrative officer of the municipality.
Specifically, the writer must respectfully dissent from his brethren insofar as they hold that under the Lawrason Act the mayor has no veto power with regard to administrative ordinances, including those hiring or firing city employees.
In my humble view, the majority has reached its erroneous opinion (1) by relying on isolated statutory sections rather than construing the statute as a whole, thus *542 reading out or ignoring various statutory provisions and wording, and (2) by arbitrarily assigning to the term “ordinance”, as used in the statute, its most restrictive sense (i. e., a legislative rule of conduct for the public), instead of its more general sense as referring to any act of a municipal council affecting the affairs of the corporation, whether administrative or legislative in nature.
Before discussing in detail these errors, it may not be inappropriate to comment further concerning the effect of the majority opinion, if it is permitted to stand.
When enacted in 1898, the Lawrason Act was the first comprehensive enactment providing a plan of government and a general legislative charter for Louisiana municipalities; and as of 1950, the provisions in question provided the basic form of government for some 173 municipal corporations of this state. Peterman, “Laws of Louisiana affecting Municipalities,” 19 West’s LSA-Revised Statutes, p. xxix et seq. Thus, as serious as the decision before us may be to the handful of municipal employees directly concerned, we cannot overestimate the general importance of this decision and its far reaching nature as radically changing the general form of municipal government throughout the state.
The Lawrason Act embodies the “strong mayor”-aldermanic form of government, as contrasted to either the “weak mayor”-aldermanic or else the commission form. Under the Act, the mayor has veto and pardoning powers, and he is statutorily made the executive of municipal affairs and is given “the superintending control of all officers and affairs of the municipality”. LSA-R.S. 33:404. (In the municipality before us, for instance, he is paid a monthly compensation of $500, indicating the full-time nature of his duties; whereas under the statute the aldermen “shall not receive pay for more than one regular meeting and ■one special meeting in any month”, LSA-R.S. 33 :405, indicating the legislative intention that the council serve as a part-time legislative body, without active participation in the daily administration of the city’s affairs).
But, to repeat, by the present majority decision the mayor is divested of all administrative powers. He has no voice whatsoever in hiring or firing employees. He has no voice whatsoever in determining which employees shall receive raises and what shall be the duties and compensation of each office. He has no voice whatsoever in municipal purchases or contracts entered into by the municipality. He is, under this decision, a figurehead. By the present majority opinion, the entire structure of municipal government in Louisiana has been converted from the mayor-alder-manic form of goverment to the mostly aldermanic system; and the usefulness of the Lawrason Act, which has with a minimum of amendment and litigation provided a general form of municipal government in this state for sixty-odd years, will be greatly impaired.
I.
The primary error of the majority opinion, in my view, is its failure to construe the Lawrason Act as a whole, the particular sections applicable to the present questions being admittedly ambiguous and susceptible of several interpretations. LSA-Civil Code Article 16, 18; Gros v. City of Thibodaux, 240 La. 279, 122 So.2d 295 (concerning a similar question arising under another municipal charter).
Construing the Lawrason Act (LSA-R. S. 33 :321 et seq.) as a whole, therefore, it is seen that the statute’s first general provisions are that all of the powers of the municipal corporation (including the power “To make all contracts and to do all other acts in relation to its property and concerns necessary to the exercise of its corporate or administrative powers”) "shall be exercised by the mayor and board of aldermen of the municipality”, LSA-R.S. 33:361, 362. By Section 401 it is provided that “The mayor and board of aldermen of *543 every municipality shall have the care, management, and control of the municipality and its * * * finances. They shall have power: [then follows 32 different specific legislative, fiscal, and administrative powers.]” Additional powers are conferred by Sections 402 and 403 upon “the mayor and hoard of aldermen” ,[1]
With the exception of the provisions granting the board of aldermen exclusive power to elect “officers” and to appoint the city attorney (LSA-R.S. 33:381, 386; about which, see II below), there is no section in the Lawrason Act which confers upon the board of aldermen any power except those to be exercised jointly by “the mayor AND the board of aldermen”. I have read the Lawrason Act from end to end several times, and I am still at a complete loss to ascertain upon what statutory section any claim of the board of aldermen to exclusive administrative powers may be based. (And, I may add, equally unavailable is any statutory section upon which the mayor’s claim to such exclusive powers may be based.)
Further, aside from pardoning and other powers conferred upon the mayor, the Lawrason Act specifically provides that the mayor “shall have the superintending control of all offices and affairs of the municipality ; shall actively and vigilantly see that all the laws and ordinances are properly executed and enforced; may veto any law, by-law, or ordinance adopted * * * ”, LSA-R.S. 33:404. It has already been mentioned that he is a full-time salaried officer, whereas under the Lawrason Act the aldermen “shall not receive pay for more than one regular meeting and one special meeting in any one month”; indicating a general legislative intention that the council’s formal duties end with attending council meetings, whereas the mayor is statutorily responsible for the day-to-day active administration of municipal affairs.
In relying upon isolated statutory sections instead of construing the statute as a whole, the majority herein has fallen into the same error as the lower courts did when reversed by our Supreme Court in Gros v. City of Thibodaux, 240 La. 279, 122 So.2d 295, 297, in considering another type of municipal charter. Therein, our State’s highest tribunal duty held that the statutory duty of an elected municipal executive that he “ ‘shall have charge of and administer the department as indicated by his title’ * * * imports the granting of exclusive authority * * * to hire and fire the employees whom he directly supervises.” Similarly, the mayor’s statutory duty to exercise “the superintending control of all offices and affairs of the municipality” and also to “actively and vigilantly see that all the laws and ordinances are properly executed and enforced”, LSA-R.S. 33:404, must necessarily imply at least a say, by exercise of the veto power, as to. which employees are to be hired or fired, or promoted or given a pay-raise or not, in connection with the efficient or inefficient performance of the duties of municipal employment of which the mayor statutorily has the “superintending control”.
II.
The majority herein brushes off the legislative delegation of municipal powers jointly to the “mayor and board of aider-men” by stating, upon what authority I cannot discern, that the legislature did not mean what it plainly said; but was referring only to the governing authority of the mu *544 nicipality, viz., the board of aldermen (of which the mayor is the presiding officer).
On the contrary, I think the Lawrason Act as a whole and its legislative history indicates that the legislature used the “mayor and board of aldermen” when it intended that the powers he jointly exercised by both as provided by the statute: the majority of the council having the power to take affirmative action, with the mayor’s concurrence; the mayor’s veto power acting as a check upon actions deemed by him unwise, and in aid of his administrative powers; with two-thirds of the council having the power to override the mayor’s veto.
The most spectacular and pertinent instance so indicating concerns LSA-R.S. 33 :381 and 386, wherein the “board of aldermen” alone is given the power to elect certain municipal officers (“a tax collector, a clerk and a street commissioner”) for two-year terms and to appoint annually a city attorney. As originally enacted by Sections 19 and ■ 23 of the Lawrason Act (Act 136 of 1898), these sections provided that these officers be elected by “the mayor and board of aldermen”, although the city attorney was to be appointed by the “Board” alone. By Act 97 of 1900, these two sections alone of the Lawrason Act were amended, so as to provide henceforth that only “the board of aldermen” should elect such officers.
I think it is reasonably obvious that, if (as the majority assumes) the legislature carelessly used “the mayor and board of aldermen” in describing to whom the municipal powers were delegated, when instead was intended only the board of aider-men, then the 1900 amendment was unnecessary. To the contrary, this instance illustrates the specific legislative intention that this power of electing municipal officers should be exercised by the board of aldermen alone; the legislature went to the trouble of enacting a special statutory amendment to so provide. But, it is important to note, the legislature never amended the statute so as to deprive the mayor of his joint role in the many other municipal powers; we must presume that the legislature knew what it was doing when it provided that the municipal powers were to be exercised jointly by the “mayor and board of aldermen” and, in the guise of judicial interpretation, we must not rewrite the legislative act and re-allocate the statutory responsibilities and powers of the municipal officers.
It is likewise well to note that, except for the election of officers provided by this 1900 amendment, all municipal powers are to be exercised jointly by the mayor and board of aldermen. As to election of officers, this special provision governs in respect to any conflict with the general provision (see State, Through Department of Highways v. Macaluso, 235 La. 1019, 106 So.2d 455, 458) that both mayor and board were jointly empowered, inter alia, to enter into municipal contracts (including those of employment) in the exercise of the municipal administrative and corporate powers. LSA-R.S. 33:361, 362, 401, 402, and 403. But the 1900 amendment, specifically limited to “officers”, did not alter the jointly exercised statutory power of both mayor aiid aldermen with regard to the entering into or terminating contracts of employment with “employees”.[2]
It is of interest that, in construing the different legislative charter of the Town of Marksville, our brothers of the Second Circuit rejected somewhat similar arguments that the legislative provision that certain powers should be exercised by the “mayor and aldermen” was intended to confer such powers only on the board of aldermen; and it found that by such language the legislature intended to vest the mayor with joint participation in such powers. Strawitz v. *545 Town of Marksville, La.App. 2 Cir., 77 So. 2d 597, certiorari denied.
A major error of the majority opinion, incidentally, is that it treats the terms “officers” and “employee” as if they were interchangeable. There is a well-recognized distinction in municipal law between the two terms, the former term generally denoting a municipal official elected to a specific term in a permanent position with definite powers, duties, and privileges under the municipal charter and exercising some of the sovereign functions of the municipal government; the latter term usually referring to employees engaged in the service of the community under the direction of municipal officers. See Cooley, Municipal Corporations (1914), 194; 3 McQuillin, The Law of Municipal Corporations (3rd ed., 1951), Sections 12.29, 12.3.0, and 12.35. “Municipal employees are not municipal officers and, conversely, municipal officers are not employees or agents. The character of the duty performed determines whether a person is an officer or employee,” 62 C.J.S. Municipal Corporations § 463, p. 895; see also: Ibid., § 701, p. 1423 et seq.
The Lawrason Act itself recognizes this distinction. See, e. g., LSA-R.S. 33:401, subsection A, providing in part that “the mayor and board of aldermen * * * shall have power: * * * (30) To provide for municipal officers other than those required by the Part who may be found necessary; to prescribe the duties and fix the compensation of all officers and employees, subject to any applicable civil service law; and to require bonds with sureties for the performance of duties from all officers and employees. (31) To provide for the removal of officers and discharge of employees. * * * ” If the legislature had not recognized the generally accepted distinction between “officers” and “employees”, the italicized additional wording would of course have been unnecessary.
And the very fact that the legislature specifically conferred upon the board of aldermen exclusive power to elect officers, but did not do so with regard to the hiring of employees or the performance of other administrative acts, seems to me to indicate a definite intent by the legislature not to confer exclusive powers upon the board of aldermen with regard to these latter administrative acts, under the accepted maxim of construction, “Inclusio unius est ex-clusio alterius” (“The inclusion of one is the exclusion of another. The certain designation of one person [or one power] is an absolute exclusion of all others”, Black’s Law Dictionary, 4th ed., 1951; p. 916).
Insofar as the majority failed to construe the Lawrason Act as a whole, it also failed to apply the “ ‘recognized rule of statutory construction that the act as a whole ought to be interpreted so that no clause, sentence, or word shall be superfluous or meaningless, if that result can be avoided,’ ” Bartley, Incorporated v. Town of Westlake, 237 La. 413, 111 So.2d 328, 333. In order to reach the result it did, the majority had to delete the repeated statutory declaration that “the Mayor and Board of Aldermen” were granted the general and specifically enumerated legislative and administrative powers of the community (LSA-R.S. 33:361, 362, 401, 402, and 403) ; the majority had to delete the statutory recognition of the distinction between employees and officers (LSA-R.S. 33:401, subsection A (30), (31)); it had to delete the statutory provision that the mayor “shall have the superintending control of all offices and affairs of the municipality” (LSA-R.S. 33 :404) ; and it had to delete from the mayor’s statutory power to veto all “any law, by-laws, or ordinances” (LSA-R.S. 33:404) the latter two terms (“by-law or ordinances”) as superfluous, by a finding that they mean identically the same thing as the first term, “law” — namely a legislative enactment providing a general rule of conduct for the community. This last deletion deserves some further attention.
III.
By LSA-R.S. 33 :404 the mayor is given the power to “veto any law, by-law, or *546 ordinance adopted” by the council; the council being given the power to override by a two-thirds vote the mayor’s veto. The majority of this court concludes, on the basis of certain excerpts from dictionary definitions and encyclopedias, that the terms “law, by-law, and ordinance” mean identically the same thing, namely, an enactment of a legislative nature providing a permanent rule of conduct for the general public.[3]
With due respect to the majority, it must be firmly stated that there is no warrant whatsoever in the Lawrason Act for holding that the “ordinance” subject to the mayor’s veto must only be such of those as constitute “laws” or general legislation, and that the mayor’s veto power does not extend to the veto of administrative ordinances. The term “ordinance” may be given the restricted meaning assigned to it by the majority; but “ordinance” is also a generic term for all acts of a municipal council affecting the affairs of a municipal corporation, whether administrative or legislative in nature. McQuillin, The Law of Municipal Corporations (3rd ed., 1951), Section 15.08, pp. 71 et seq.; 62 C.J.S. Municipal Corporations § 411, p. 784 ; 30 Words & Phrases pp. 143, 152, 1961 Pocket Part, 56, 58, Ordinance, at the sub-heading “Resolution Included” (this last source indicating that in at least eleven jurisdictions, the use of “ordinance” in this generic sense is recognized, including California, New York, Pennsylvania, Tennessee, Missouri, Illinois, Indiana, Ohio, Vermont, North Dakota, and South Dakota).
The Lawrason Act itself draws no distinction, as does the majority, between an “ordinance” on the one hand and a “motion” or “resolution” on the other. These latter terms are never used in the statute as referring to any final enactment of the board of aldermen. But in at least two provisions of the original statute, which remain unamended to the present day, the Louisiana legislature used the terms “ordinance” or “ordinances” in their broader generic sense as including not only general legislative enactments, but also any other enactment of the council, such as those of an administrative nature.[4]
It may well be, as the majority of this court has concluded, that in the particular statutes concerned in certain other states the term “ordinance” was used in the restrictive sense assigned to it by the majority. But, as in many other statutes of many states, in the Lawrason Act — the only statute with which we are concerned- — the Louisiana legislature itself employed the term “ordinance” in the broader generic sense.
Where, then, does the majority find its authority for determining that the statutory power of the mayor to veto “any law, bylaw, or ordinance” applies only to “legis *547 lative” ordinances and not to “administrative” ordinances?
Not in the Lawrason Act, certainly, as thus noted. Not in any decision of Louisiana courts, as is admitted. No, what the majority seems to rely upon, if anything, is an Opinion of the Attorney General of Louisiana, 1942-1944, p. 953, which came to such a conclusion on the basis of five decisions in other states concerning totally different statutes and charters. The majority overlooks that this opinion was later overruled and rescinded by the Louisiana Attorney General as without authority in Louisiana law, the Attorney General being of the considered formal final opinion that the mayor’s veto power extends to administrative as well as legislative ordinances and includes the power to veto the appointment of employees. Opinions of the Attorney General, 1952-1954, p. 144; Opinions of the Attorney General, 1956-1958, p. 535.
There is no evidence in the record as to the administrative construction over the years of the statutory provision in question. We are fortunate, however, that the settled administrative construction is indicated in the decision of State ex rel. Chapman v. Guidry, La.App. 1 Cir., 41 So.2d 524, concerning the veto power of the mayor with regard to the hiring by resolution of employees in the same municipality as that with which we are presently concerned. The question there raised was simply whether the mayor could veto the over-riding of his veto by a two-thirds vote of a resolution employing a graderman, and the court held that he could not re-veto the resolution previously passed over his veto by the necessary majority.
While the decision does not directly pass upon the present question — because no contention was even suggested that the mayor did not have the power to veto the hiring of employees — , nevertheless the decision is indicative of the settled municipal practice, under which the mayor was regarded as having veto power with regard to the hiring of municipal employees. It would have been unnecessary to discuss the effect of his second veto had not all the parties and the court conceded that the first veto was effective until over-ridden by a two-thirds vote.
In holding that the veto power of the mayor is effective only as to the council’s acts of a legislative nature providing a permanent rule of conduct for the general public, the majority of this court has thus held that the mayor’s veto power does not extend to all other acts of the council of an administrative nature, including the approval of contracts, the hiring or firing of employees, the approval of rates of pay or salary raises or municipal contracts, the purchase of chairs, the provision of the hours of work for the municipal employees, etc. To repeat an earlier observation, this construction, assigning the mayor not the slightest say or formal power with regard to administrative acts of the municipality, is unwarranted by the construction of the Lawrason Act as a whole, by which the mayor is specifically given “superintending control of all offices and affairs of the municipality” and is made the chief executive of the community, and not merely the nonvoting chairman of the council.
IV.
The suggestion is made that it will lead to chaos and confusion if the mayor is given some voice in the hiring and firing of employees. It is pointed out, for instance, that the street commissioner is elected by the council, not appointed by the mayor; and that, if the mayor were permitted to veto employees hired by the council upon the recommendation of the street commissioner or to veto the firing of employees previously hired, then these employees would owe their allegiance to the mayor rather than to their immediate supervisor, the street commissioner.
What this argument overlooks is that the employees should owe their allegiance both to the mayor and to the street commissioner. Statutorily, the street commissioner has *548 general duties with regard to the streets, but “under the direction of the mayor and board of aldermen,” LSA-R.S. 33:426. Statutorily, the mayor “shall have the superintending control of all offices and affairs of the municipality,” LSA-R.S. 33 :- 404. Under the majority’s interpretation, the employees in the street department and all other employees can completely ignore the mayor’s directions and advice concerning the performance of their duties, for the mayor has no say whatsoever as to who is fired or hired, or given a raise or promotion, or refused one. Thus, if the majority opinion is correct, the mayor, who is, both under the statute and in the eyes of the public, primarily responsible for the running of the municipality and the execution of its ordinances, has no administrative powers whatsoever commensurate with his administrative duties.
In my opinion, the legislature could never have intended so impractical a result and so impractical a form of government. What was reasonably intended, it seems to me, is that the council, acting through a majority, and the mayor, by use of his veto if the council’s administrative actions are unacceptable, should both, concur in administrative actions; and if (as would generally not be the case) they cannot resolve their disagreements by satisfactory accommodation of both views, the council has the ultimate power to override the mayor by a two-thirds vote.
The further suggestion is then made that, if the mayor’s veto power is extended to administrative affairs, the municipal government will be unworkable, since neither mayor nor council has the complete responsibility for affirmative action.
This argument overlooks the lesson of American history, and the very successful and peculiarly American general system of governmental checks and balances in the division of governmental power between the executive and the legislature — the executive veto serving as a check upon the legislative branch, and the necessity of securing a legislative majority, as well as the power of the legislature to override an executive veto by a two-thirds vote, serving as legislative checks on the executive. This is the system that has worked so well in our national and state governments since America was first a nation, and I think it is undoubtedly the system that our legislature intended to incorporate into the Lawrason Act, an instance of the national trend in the latter part of the nineteenth century and up until the present to increase the powers of the mayor and to center in him administrative responsibilities for the municipality. See 2 McQuillin, The Law of Municipal Corporations (3rd ed., 1951), Section 9.13 (p. 498), 9.16 (p. 506), 9.18 (p. 509) ; also, 3 McQuillin, above cited, Section 12.43 (p. 196).
After all, the mayor as well as the council is elected by a majority of the people, and they are both responsible to all the people. It is to be supposed that they, all being conscientious men, will exercise their joint powers in a joint spirit of accommodation and search for the general good, each party sensibly giving and taking a little in such worthy spirit; and that anarchy will no more result when the mayor is from one faction and a majority of the council from another, than it did in the national government recently when for six years the Republican President Eisenhower served as executive and the opposition Democrats controlled the legislative branch.
In concluding, the writer cannot too strongly urge that the unintentional effect of the decision by his esteemed brethren of the majority is, on the basis of isolated statutory sections and excerpts from dictionary definitions, to nullify the enactment by our legislature of the general form of municipal government provided by the Lawrason Act, so as in effect to abolish the office of the mayor and to change the government of the nearly two hundred municipalities chartered under it from the mayor- *549 aldermanic plan to the purely aldermanic plan. Such a revolutionary change is a matter for the legislature, not the courts, and I therefore must respectfully dissent.

. These provisions should be contrasted with the equivalent provisions in the “commission plan” of municipal government authorized by LSA-R.S. 33:501, where equivalent powers are delegated to “the council” alone. -In that form of government, the mayor is merely a chairman of the counsel meetings'; he is not the chief executive and administrative officer of tlie community, and be possesses no veto or pardoning powers. In short, he occupies the same sort of status as-that to which the majority opinion herein reduces the mayor under the Lawra-son Act, which the legislature intended: to bo another form of municipal government.

. By law, employment contracts are indefinite in term and terminable at will of either party, unless otherwise provided by the contract; LSA-C.C. Arts. 2746, 2747; United Credit Co. v. Croswell Co., 219 La. 993, 54 So.2d 425.

. Under the rule of construction above quoted in the Bartley decision, above-cited, 111 So.2d 333, it seems to me far more probable that the legislative provision that the mayor “may veto any [1] law, [2] by-law, Or [3] ordinance” was not intended to mean that the mayor may veto only, identically, (1) general legislative enactments, (2) general legislative enactments or (3) general legislative enactments. Rather, it seems to me that the cumulative sense must be that the mayor is given the power to veto any (1) general legislative enactments, (2) internal administrative rules, or (3) other formal acts of the council (included as an “ordinance” within the recognized generic sense of the term).

. In LSA-R.S. 33:406, the legislature provided that the ordinances required to be formally recorded in the book of ordinances are only “those which are in their nature laws of the municipalities”, but not those which are “mere orders or decrees temporary in their nature”. In LSA-R.S. 33:462, the legislature provided that all expenditures should be' made pursuant to a specific appropriation and by warrant specifying its purpose, which warrant shall also cite “the ordinance authorizing its issue”; indicating that included within the term “ordinance” as used by the statute were acts of the council appropriating monies, certainly being of an administrative nature.